UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ERGON-WEST VIRGINIA, INC., ET AL.                                                PLAINTIFFS

V.                                                        CIVIL ACTION NO.: 3:06cv714-DPJ-LRA

DYNEGY MARKETING & TRADE                                                          DEFENDANT

**<u>ORDER</u>**

This cause is before the Court on a variety of pretrial motions: Defendant Dynegy Marketing & Trade's ("Dynegy") Motion in Limine [74]; Dynegy's Motion to Exclude the Testimony of Michael Harris [75]; Plaintiffs Ergon West-Virginia, Inc. and Ergon Refining, Inc.'s (Ergon Plaintiffs) Motion to Exclude or, in the Alternative, Limit Testimony of Defendant's Expert [76]; and the Ergon Plaintiffs' Motion in Limine [91].  The Court has fully considered the parties' submissions and the applicable law, and finds that Dynegy's Motion in Limine [74] and Motion to Exclude [75], and Plaintiffs' Motion to Exclude [76] are all granted in part and denied in part.  The Ergon Plaintiffs' Motion in Limine is denied without prejudice.

I.      Background

Dynegy and the Ergon Plaintiffs entered separate natural-gas contracts in which Dynegy agreed to supply the Ergon Plaintiffs.  After Hurricanes Katrina and Rita in 2005, Dynegy claims to have lost its supply of natural gas and therefore invoked the force-majeure clauses of the two contracts.  In the simplest possible terms, the Ergon Plaintiffs contend that Dynegy breached its duties under the contracts, and that Dynegy should have attempted to obtain replacement gas to furnish Ergon.

The parties present various motions seeking to exclude evidence, including expert testimony.  Following the final pretrial conference, the Court ordered the parties to announce

whether agreement could be reached as to the competing expert motions and if not to indicate whether a hearing would be necessary. The time to respond passed without comment, and the matters are ripe for decision on the current record. There is no dispute that this Court exercises diversity jurisdiction and that under Mississippi choice-of-law analysis, Texas substantive law applies.

II.     *Daubert* Motions

The district court fulfils a gatekeeper function to exclude irrelevant or unreliable expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 & n.7 (1993). This function begins with Rule 702 of the Federal Rules of Evidence, which regulates admission of expert testimony. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Whether a proposed expert should be permitted to testify under Rule 702 "is case, and fact, specific." *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (citation omitted). Thus, the district court retains "'broad latitude' both in deciding how to determine whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable." *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142(1999)). "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir.

2002). The issues before the Court include objections based on credentials and the reliability of opinions.

Beginning with qualifications, Rule 702 plainly states that the expert must posses the requisite "knowledge, skill, experience, training or education." Fed. R. Evid. 702. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). But "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Holbrook v. Lykes Bros. S.S. Co., Inc*., 80 F.3d 777, 782 (3d Cir. 1996) (reasoning that "most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility")). Moreover, a witness can be qualified as an expert "even though he lacks practical experience, provided that he has received suitable training or education or has otherwise gained the requisite knowledge or skill." *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 176–77 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp*., 37 F.3d 1069 (5th Cir. 1994).

Turning to reliability, "a party seeking to introduce expert testimony must show '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007)

(quoting Fed. R. Evid. 702)). The court should "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The gatekeeper function of the district court does not, however, replace trial on the merits. In performing this function,

> the district court should approach its task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."

*United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

    A.    Dynegy's Motion to Exclude Dr. Michael Harris

The Ergon Plaintiffs designated Dr. Michael Harris, Ph.D., to provide expert testimony regarding the history and use of force-majeure provisions in natural-gas supply contracts. They also tendered Harris to provide testimony regarding market conditions present in the wake of Hurricanes Katrina and Rita as well as damage calculations. Dynegy moves to strike or limit Harris's testimony claiming that he is not qualified to discuss force-majeure provisions and that certain opinions are not reliable.

        1.    Qualifications

According to his curriculum vitae, Harris holds a Ph.D in Economics from the University of Washington and has been a consulting economist for various energy interests for the past nineteen years. Harris claims to provide consulting services in a wide variety of energy-

market and contract-related areas, and he survives a Rule 702 challenge in many respects. But "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009); *accord Smith*, 495 F.3d at 227 (finding expert lacked expertise to testify on "the pertinent questions"). In other words, the expertise must fit the subject area, and this is where Dynegy pounces.

Of primary concern are Harris's opinions regarding force-majeure provisions in natural-gas supply contracts.[1] As stated, the parties dispute whether Dynegy properly invoked the force-majeure provisions of the subject agreements. Among other things, the Ergon Plaintiffs designated Harris to opine on "the commonly held industry perspective of how such provisions were intended, and are expected, to be invoked." Pls.' Expert Designation [47] at 1. Harris was also proffered to discuss how Dynegy may have "fulfill[ed] its contractual obligations." *Id*. at 2. On this latter point, Dynegy observes Harris's deposition testimony in which he seems to opine, as a matter of economics, that Dynegy breached the contract by failing to secure replacement gas. Def.'s Mot. [75] at 10 (citing Ex. B, Harris Dep. at 17–18).

Harris's qualifications are at best thin in the area of force-majeure provisions. According to Plaintiffs, Harris's expertise derives from his consulting business in which he routinely addresses issues of "pricing . . . and supply and supply reliability and demand forecasting." Pls.' Resp. [79] at 2. More specifically, the Ergon Plaintiffs point to Harris's testimony regarding

---

[1] Dynegy appears to focus on this aspect of Harris's opinions and has not directly challenged his qualifications to discuss other matters, such as damage calculations.

5

work with utilities in the area of incentive rate making and reliability assessments.  *Id*. at 3.

During his deposition, Harris explained how these tasks relate to force majeure:

> With respect to incentive rate making, I've done a significant amount of work assisting utilities develop what are called gas cost incentive mechanisms, essentially allowing a utility to procure its gas in the most efficient manner. . . . One of the issues related to reliability of supply is the declaration of force majeure when it's not appropriate. . . .
>
> . . . So in these proceedings, the discussion surrounds the reliability of supply and identifying suppliers who engage in that sort of behavior and ensure the utility does not contract with them.  So at a sort of broad level, that's where force majeure enters into with respect to incentive rate making.

Harris Dep. 19:21–20:20.  Ergon cites no specific record evidence establishing Harris's qualifications in the area of force-majeure provisions other than those passages of testimony addressing incentive rate making.  Even at its best, this exposure to force majeure offers no basis for opining on "the commonly held industry perspective of how such provisions were intended, and are expected, to be invoked."  Pls.' Expert Designation [47] at 1.

Ergon then generally cites pages 20 through 40 of Harris's deposition as evidence of his "extensive" expertise in force-majeure provisions, but review of that testimony further undermines Harris's qualifications.  For example, Harris conceded that he had never determined whether a supplier improperly claimed force majeure.  As he testified, "[I]t's up to the utility to tell the consultant and the regulatory body about that sort of behavior and identify those suppliers. . . .  So it's the – up to the utility and it's *within their experience* in having them identify those types of suppliers . . . ."  Harris Dep. 21:23–22:9 (emphasis added); *see also id.* at 29:5–21, 33:11–14.  In other words, Harris is not the person who evaluates what the provisions require and whether they were breached.  He relies on the experience of others for that determination.

The lack of personal experience with force majeure provisions became even more apparent as the testimony continued. For example, Harris generally provided the same type testimony regarding prior consultations:

> Q. Did you analyze any specific declaration of force majeure by any supplier as part of your work in [a specific prior consulting job]?
>
> A. . . . the answer is no . . . .

*Id.* at 35:1–5. The questioning then switched to his litigation experience. Harris indicated that he had been retained, but did not testify, as an expert on issues related to force majeure in a recent case identified as the "Cherokee case." It appears that his report in that matter "parallels" his report in this case. *Id.* at 40:21–24. He then testified as follows:

> Q. None of the other matters . . . deal with the specific issue of whether a party to the litigation rightfully or wrongfully declared force majeure. Is that a fair statement?
>
> A. That's a fair statement.
>
> . . . .
>
> Q. And so you have not ever offered testimony in any case—deposition or trial, in any case where the specific issue was whether a party to the litigation rightfully or wrongfully declared force majeure under a gas supply contract. Is that a fair statement?
>
> A. That's correct.

*Id.* at 36:8–25.

> Q. Are there any cases where you have offered testimony on standards and practices with respect to declaring force majeure in the gas trading industry?
>
> A. I think we've already gone over this. And the answer is no.

> Q. Any other cases in which you've testified as an expert on standards and practices for what must be included in a declaration of force majeure in the gas trading industry?
>
> A. No.

*Id.* at 38:24–39:9.

Elsewhere in his deposition, Harris admits that he has never worked for a company that trades or produces gas, *id.* at 10; worked for a gas marketer, *id.*; traded gas, *id.*; drafted a gas purchase agreement, *id.*; drafted a gas supply contract, *id.* at 11; negotiated a gas supply or purchase contract, *id.*; drafted or negotiated a force majeure provision, *id.*; declared a force majeure event on behalf of a company, *id.*; written any articles or given any presentations on force majeure in the energy industry, *id.* at 25.

In sum, it appears that Harris's experience with force-majeure provisions is limited to evaluating potential contracts when a utility tells him that a supplier has a history of wrongfully declaring force majeure. The Ergon Plaintiffs have not identified any other source of knowledge, skill, experience, training or education in this narrow area. Based on his experience, Harris has sufficient qualifications to testify that buyers are concerned about sellers who claim force majeure and that they factor that concern into their decisions, but the Ergon Plaintiffs failed to meet their burden of demonstrating that Harris possesses the requisite qualifications to generally opine about "the commonly held industry perspective of how such provisions were intended, and are expected, to be invoked." Pls.' Expert Designation [47] at 1.

      2.      Basis of Opinions

Assuming without conceding that Harris is qualified, Dynegy next outlines certain opinions that should be stricken as unreliable. The issues will be taken in turn.

                a.       Harris's opinions regarding alternative sources of gas available to Dynegy[2]

According to Dynegy, Harris's opinions regarding other sources of gas are highly misleading and without foundation. But as Plaintiffs note, these arguments address the weight and interpretation of the evidence, not the reliability of the underlying facts. *See Daubert*, 509 U.S. at 596 (noting that "[v]igorous cross-examination" and other traditional safeguards are "appropriate means of attacking shaky but admissible evidence"). Harris's experience in the industry allows him to address this subject area, and his theories may be tested on cross examination. This portion of the motion is denied.

                b.       Harris's opinions regarding Dynegy's duty to obtain alternative sources of gas and the Ergon Plaintiffs' "expectations"

During Harris's deposition, he attempted to couch this opinion in terms of economics, but the opinion offers a clear comment on the interpretation of the contract terms and Dynegy's duties. As a general matter, contract interpretation and determination of breach are legal matters for the Court. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). And as such, courts have excluded expert testimony regarding contract interpretation. *See, e.g., STMicroelectronics, Inc. v. SanDisk Corp.*, 2007 WL 4532662 (E.D. Tex. Jan. 24, 2007) ("As a general rule, contract interpretation is a legal question for the Court to decide. An expert witness may not provide legal conclusions. Since contact interpretation is a legal question for the Court to decide. . .expert opinions on legal questions are unnecessary and inappropriate") (cite omitted); *Sowell v. United States*, 198 F.3d 169, 171–72 (5th Cir. 1999)

---

[2]The Court will address the first two opinions Dynegy challenges in this section.

(affirming district court's decision to exclude testimony of expert witness offering and legal interpretations). But in the present case, the Court has now ruled that the contract language is ambiguous, and the jury must therefore decide the parties' intent. *See Columbia Gas Transmission Corp.*, 940 S.W.2d at 589.

To begin with, there are no factual disputes about what happened. The question is what the parties intended in their contracts. Once the jury answers that question, the Court will decide, as a matter of law, whether Dynegy breached. *ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 254 n.3 (Tex. App. 1990). This area of Harris's testimony, like that of Dynegy's expert, reaches the ultimate issue of whether Dynegy breached the contract. The testimony will not assist the Court in making this legal determination, and it presents an impermissible risk of unfair prejudice and confusion that substantially outweighs the probative value of the testimony. Fed. R. Evid. 403.

The parties' intent, by contrast, does present a factual question for which some form of expert testimony is admissible. In this case, the Ergon Plaintiffs and Dynegy have essentially adopted the same position regarding such evidence. First, both contend that the other's expert should not be allowed to interpret the contract. *See* Pls.' Mot. [76] at 3–4; Def.'s Mot. [75] at 11. Similarly, both contend that if the contract is ambiguous, as the Court has now ruled, then their expert should be allowed to testify regarding industry customs and practices. *See* Pls.' Resp. [79] at 6 (citing *First United Fin. Corp. v. U.S. Fidelity & Guar. Co.*, 96 F.3d 135, 138 (5th Cir. 1996) (Garza, J. concurring) (expert testimony on industry custom permissible); Def.'s Resp. [77] at 5 (citing *Kona Tech. Corp. v. So. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000)). These parameters fall within the Court's discretion and are hereby adopted.

But these guidelines presuppose that the expert is qualified to render the opinions. Here, the Ergon Plaintiffs failed to demonstrate that Harris is qualified to opine about industry custom and practices as they relate to obligations under a force-majeure clause. His testimony is therefore limited, and he may not offer opinions regarding Dynegy's contractual duties or the Ergon Plaintiffs' specific expectations in drafting the document. This portion of the motion is granted. That said, Harris does possess sufficient experience to testify that buyers are conscious of suppliers who improperly invoke force majeure provisions in contracts. As discussed below in Part II(A)(2)(c), this industry concern is relevant to the intent of the parties and how they might draft these provisions.

>    c.   Harris's use of the term "sordid history" when referring to force majeure in the natural-gas industry and the opinion that gas sellers commonly declare force majeure in order to sell their gas at a higher price[3]

Dynegy contends that the term "sordid history" is inflammatory, without foundation, and unhelpful to the jury. It further contends that it did not engage in the practice of declaring force majeure to sell at a higher price, rendering the opinion irrelevant and confusing.

Starting with foundation, Harris testified that the issue was a typical consideration for his clients when they determined whether or not to contract with certain suppliers. The testimony is therefore relevant to the jury's function in this case. If, as Harris contends, buyers express concern over a "sordid history" of abuse, then it is probative of the parties' knowledge and intent in drafting force-majeure provisions. In other words, this concern would impact how

---

[3]Dynegy raised these issues separately, but they overlap and will be addressed together.

knowledgeable industry players like Dynegy and Ergon would address the issue in their contracts.

The Court acknowledges some potential for confusion since Harris testified that Dynegy did not declare force majeure to sell at a higher price. But Plaintiffs contend that Dynegy's decision was similarly motivated by economics. In any event, the risk of confusion is reduced by the ruling that Harris will not testify that Dynegy breached. It follows that there should be no inference that Dynegy acted in conformity with this alleged pattern. Moreover, Harris will be subject to cross-examination. Thus, the risk of the jury mistakenly thinking that Dynegy followed this exact pattern of alleged abuse does not substantially outweigh the probative value of the testimony regarding the contracting parties' knowledge of the potential for abuse. This portion of the motion is therefore denied.

      B.     Ergon's Motion to Strike Broxson [76]

Dynegy designated Bob Broxson as an expert in the natural-gas industry. Unlike the analysis involving Dr. Michael Harris, there is no objection to Broxson's qualifications. Instead, the Ergon Plaintiffs focus on the reliability and admissibility of certain opinions found in Broxson's report and deposition testimony. In particular, they contend that many of Broxson's opinions are "nothing more than his own legal conclusions and interpretations of language in the subject contracts." Pls.' Mot. [76] at 3. The Ergon Plaintiffs further contend that Broxson's opinions are without foundation.

      1.     Legal Opinions

Broxson's primary opinion is that "Dynegy's inability to deliver the entire contract quantity of gas in the aftermath of Hurricanes Katrina and Rita was excused by the force majeure

12

provisions in the Agreements." Pls.' Mot. [76] Ex. A, at 3. Broxson will not be allowed to offer this opinion for the same reasons that Harris may not offer legal conclusions. But not all of Broxson's opinions fall within this category.

Broxson's report and his deposition testimony provide several opinions regarding industry custom and practice. For example, he rebuts the contention that Dynegy failed to give proper notice of force majeure, stating that in his experience, Dynegy provided "the type of information that is standard and expected in the industry." *Id.* ¶ 12. He also contends that the Ergon Plaintiffs' interpretation of the contracts as requiring Dynegy to seek alternative sources if gas "is available anywhere at any price is inconsistent with industry custom and practice."[4] *Id.* ¶ 17.

When asked during his deposition to elaborate on his opinions, Broxson explained them in the context of industry custom and policy. The Court will not attempt to address all of the statements as the following offer a representative example:

> Q: Chevron could have put gas into the pool and supplied its obligations to Dynegy?
>
> . . . .
>
> A: Well that's where you and I have a fundamental disagreement . . . with regard to what force majeure is. To say you have to resupply a force majeure agreement is totally outside what the industry would expect or understand. And I don't think you could find any case where that would be the–the position of anyone who actually trades this business on a day-today basis unless it's in their contract and the contract calls for them to resupply.

---

[4] Plaintiffs contend that Broxson misconstrues its interpretation, but they have made similar statements, and their argument goes to weight.

Def.'s Resp. [77] Ex. B, Broxson Dep. 67:12–68:1.  Similarly, Broxson testified that in his twenty-nine years of experience, "there's never been a case unless it's in the contract, that in the case of a force majeure that there has to be a resupply.  It has to be in the contract."  *Id.* at 69:13–17.  Broxson expounded on this opinion when he testified:

> My opinions are about industry practice with regard to force majeure. This force majeure clause is just like a hundred or a thousand other ones I've read and every once in a while there is a force majeure clause that says that you have to resupply. In history, those existed.  To make the assertion or the assumption that they have to resupply is outside the bounds of industry practice.

*Id.* at 82:1–9.  This final passage offers a good example of industry custom and practice that is probative of the issues before the jury.

        2.        Basis of opinions

The Ergon Plaintiffs contends that Broxson's opinions lack a reliable basis.  For instance, they argue that Broxson offers opinions based on experience without providing examples of industry custom or practice as they relate to these issues.  Pls.' Mot. [76] at 5.  But Broxson did provide specific custom and practice testimony such as the above quoted passage from his deposition.  Moreover, the Ergon Plaintiffs accepted Broxson's qualifications in this area, and his experience in negotiating hundreds of natural gas contracts and force-majeure provisions, Broxson Dep. 18, 70–71, provide a basis for opinion.  *See Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 366 (5th Cir. 2006) ("In addition, *Kumho Tire* recognized that experts may testify on the basis of their own 'personal knowledge or experience.'") (quoting *Kumho Tire Co.*, 526 U.S. at 149).  And as Ergon argued in defense of Harris, cross examination and other traditional safeguards are an appropriate means of attacking the testimony.  *See Daubert*, 509 U.S. at 596.

The Ergon Plaintiffs also posit that Broxson cannot rely on two reported decisions regarding force majeure as his basis for stating that the hurricanes were considered force-majeure events within the industry. Pls.' Reply [81] at 2. But Broxson's testimony was not based on those cases alone. He also referenced other suppliers that declared force-majeure following the 2005 hurricanes—including Dynegy's suppliers. Although Plaintiffs acknowledge these other examples in a footnote, they maintain that the facts surrounding those force-majeure events are not sufficiently known to be relied upon. But those events resulted from the same occurrences, and Plaintiffs' argument goes to weight.

In sum, the Ergon Plaintiffs' motion is granted to the extent it seeks to preclude Broxson from interpreting the contract language or declaring that Dynegy was not in breach. It is denied to the extent it can be read as seeking to preclude Broxson from testifying in general or from offering testimony regarding industry custom and practice related to force majeure.

III.    Motions in Limine

Both parties seek in-limine orders precluding certain evidence. The Fifth Circuit Court of Appeals has observed:

> A motion in limine is a motion made prior to trial for the purpose of prohibiting opposing counsel from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' minds.

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977) (citation and quotation omitted).

A.  Dynegy's Motion In Limine [74]

Dynegy's motion lists fifteen subject areas that it seeks to exclude from evidence and lists each in separately numbered sections.  The Ergon Plaintiffs limited their response to sections 2 and 4, conceding the exclusion of those items identified in sections 1, 3, and 5–15.  Although the uncontested portions of the motion are granted, almost all deal with routine procedural or evidentiary matters that will apply equally to both parties.  The disputed subjects are handled separately.

1.  Subject Area 2:  Reference to "Lost Opportunity" or "Other Damages" Where Plaintiffs Did Not Cover

Dynegy seeks exclusion of any evidence related to "lost opportunity" or "other damages," contending that under "the plain language of the contract, Ergon Refining, Inc. cannot sit on its hands, fail to cover, and then attempt to stick Dynegy with lost profits damages." Def.'s Mot. [74] at 2. Section 2.4 of the Ergon Refining, Inc. contract, titled "Buyer's Cover," provides:

> In the event of Seller's unexcused failure to deliver the [Daily Contract Quantity], Buyer *may* cover by making a reasonable purchase or substitution for Seller's gas until Seller can resume delivery.  If the cost of cover exceeds the Contract Price hereunder, Seller will pay Buyer the difference between the cost of cover and the Contract Price for the duration of such failure.
>
> (Emphasis added).

The contract further provides that "[n]either party shall be liable in any event for consequential damages or losses which may be suffered by the other as a result of the failure to deliver or take the required quantities of gas."

16

As the Ergon Plaintiffs note, the contract does not require cover. It states that "Buyer (Ergon) may cover . . . ." In this sense, the contract seems to track Texas law. *See* Tex. Bus. & Com. Code Ann. §§ 2.711, 2.712, 2.713 (Vernon 1968).[5] Thus the contract does not require cover as a predicate to recovering damages, and appears to allow typical breach-of-contract damages associated with a failure to deliver goods. *Id.* Plus, whether the Ergon Plaintiffs covered is a question of fact, as is the extent to which they were allegedly damaged. Finally, this portion of the motion appears to address the substance of the claims, yet it was not raised in a dispositive motion. Dynegy has offered no legal authority or analysis for its position, and its motion is denied.[6]

        2.        Subject Area 4: Reference to Other Lawsuits or Proceedings Involving Dynegy Companies or Employees

Dynegy seeks to exclude reference to other suits or proceedings pursuant to Rules 401 and 403 of the Federal Rules of Evidence. Plaintiffs generally accept Dynegy's position—at least to the extent the other matters might be offered as substantive evidence—but maintain the right to impeach Dynegy's witnesses if their testimony differs from testimony in prior proceedings. The Court agrees and therefore grants this motion in part. Plaintiffs may cross-

---

    [5]    Upon a seller's failure to deliver the goods, a buyer may either (1) "cover" by purchasing goods in substitution of those due from the seller, and recovering damages for the difference in the price of the contract and the "cover," or (2) recover the difference between the contract price and market price at the time he learned of the breach.

    *Mueller v. McGill*, 870 S.W.2d 673, 675 (Tex. App. 1994).

[6]If Dynegy wishes to revisit the matter at trial, it is instructed to provide a bench brief addressing the substance of the Ergon Plaintiffs' legal responses to this portion of the motion. Ergon may likewise present a bench brief to the extent it wishes to amplify its Response.

17

examine witnesses with prior testimony but may not identify the origin of the testimony without first raising the issue with the Court outside the presence of the jury. In other words, prior to approval, they may not indicate that the testimony was taken in another matter. The motion is otherwise granted.

      B.      Ergon Plaintiffs' Motion in Limine [91]

The Ergon Plaintiffs seek to exclude testimony that Lion Oil, a company apparently affiliated in some way with the Plaintiffs, declared force majeure on a prior occasion. The Court granted Dynegy's motion [93] seeking discovery of these circumstances. Order [101] Oct. 27, 2010. While Plaintiffs potentially raise a valid Rule 403 objection, the Court is reluctant to rule in limine without knowing the results of the discovery. Accordingly, this motion is denied without prejudice. The Ergon Plaintiffs are invited to reurge the issue prior to trial so it can be addressed on a more complete record.

IV.    Conclusion

The pending motions raise a number of issues, and it is impossible for the Court to completely address every conceivable ramification of this order. Thus, the Court anticipates a certain level of fine tuning as the evidence is presented. Nevertheless, for the reasons stated above, Dynegy's Motion in Limine [74] and Motion to Exclude [75], and Plaintiffs' Motion to Exclude [76] are all granted in part and denied in part. The Ergon Plaintiffs' Motion in Limine [91] is denied without prejudice.

The parties are ordered to contact Courtroom Deputy Shone Powell to set this case for telephonic status conference.

      **SO ORDERED AND ADJUDGED** this the 25th day of February, 2011.

                                     s/ *Daniel P. Jordan III*
                                     UNITED STATES DISTRICT JUDGE